LYLE *v.* LATOURETTE.

4-7820                                    192 S. W. 2d 521

Opinion delivered February 11, 1946.

Rehearing denied March 11, 1946.

722

*Claude B. Brinton,* for appellant.

*Foster Clarke* and *Roy Penix,* for appellee.

McFADDIN, J.  This appeal stems from an attempt by the appellee to enforce a materialman's lien on certain real estate owned by appellant.  There is considerable dispute on some of the facts; but we give the version adopted by the Chancery Court and supported by the preponderance of the evidence.

Appellant, J. E. Lyle, was desirous of repairing and improving his residential property in Jonesboro, Arkansas. P. M. Latourette owned and operated a retail lumber yard in Jonesboro under the trade name of "Jonesboro Builders' Supply Company"; and J. N. Swanson was Latourrette's trusted employee, being in fact in this case the "*alter ego*" of Latourette. In order to sell the lumber and supplies for the Lyle job, Swanson not only prepared the specifications for the work, but also persuaded Walter Hollingsworth and Ace Patillo—local carpenters—to become the contractors to do the Lyle work.

Accordingly, a written contract was signed on March 27, 1943, whereby Hollingsworth and Patillo, for $3,584, to be paid by Lyle as the work progressed, undertook to furnish all labor, materials, and supplies, and to complete the repair work and improvements, according to the specifications. One of the specifications called for ceiling the attic with insulation board or beaver board. In order to induce Hollingsworth and Patillo to take the Lyle contract at the price named, Latourette—either in person or by Swanson, who was acting for him at all times—agreed with Hollingsworth and Patillo to furnish the material and complete the attic insulation for $540 as a subcontract. This is referred to herein as the "attic subcontract," and is separately discussed. After deducting the attic subcontract, the net to Hollingsworth and Patillo was to be $3,044. As the work progressed, and up until July 28, 1943, Latourette furnished lumber, brick and supplies for the Lyle job in a total in excess of $1,400, independent of the attic subcontract. Lyle paid out on the contract during this period of time a total of $2,527, of which $1,000 went to Latourette on his said account, and $1,527 went to Hollingsworth and Patillo for their services.

The work, begun so auspiciously, ended in misfortune for all concerned: In August, 1943, Hollingsworth and Patillo found that they could not complete the contract at a profit, so they abandoned the work. Then a dispute arose between Lyle and Latourette; and on Au-

gust 9, 1943, Lyle's attorney addressed to Latourette a letter which gives most clearly the situation then existing between Lyle and Latourette:

"Confirming our telephone conversation of this morning, will say:

"The job of attic insulation is a separate and independent job which your firm received by subcontract from Patillo and Hollingsworth and upon satisfactory completion the contractors were under obligation to pay you the sum of $540.

"It is our understanding that to date Mr. Lyle has paid to Patillo and Hollingsworth $2,527, of which you received some payments on the material bill and that you have a balance charged of $317.

"It is understood that you will complete the attic insulation immediately.

"All work and material must be according to specifications of the original contract."

The $317 mentioned in the letter—by subsequent purchases and returns, and by correction of bookkeeping errors—became $401.50, for which amount Latourette filed his lien claim on September 27, 1943. Then, on October 5, 1943, Latourette filed this suit against Hollingsworth and Patillo as the contractors, and Lyle and his wife as owners, seeking to obtain and enforce a materialman's lien under § 8865, *et seq.*, of Pope's Digest. Hollingsworth and Patillo each defaulted, and gave depositions for the other defendants. Lyle, by answer and cross-complaint, made various defensive and offensive attacks upon the claim. These attacks will be listed and discussed hereinafter. The trial resulted in a default decree, against Hollingsworth and Patillo for the full amount of the claim, and also a decree and lien for Latourette against Lyle's property for $386.50 and interest at 6 per cent. as hereinafter mentioned, and also a foreclosure of the lien. Lyle brings this appeal, urging the contentions here which he urged below. The Chancery

Court made detailed findings which are in the decree, and which have been most helpful to us in our deliberations.

I.  *The Position of Latourette in the Building Contract.*  Lyle claims that Latourette was the real party in interest in the $3,584 contract, and that Hollingsworth and Patillo were virtual "stooges"; that Latourette and Swanson were supervising the entire work, and Lyle dealt with them and not with Hollingsworth and Patillo. On this claim Lyle contends that he should recover on his cross-complaint against Latourette for several hundred dollars which it cost Lyle to complete the repairs and improvements according to the specifications. There is much testimony going to support Lyle's contention: (1) Latourette undertook to repair the stairs which were no part of the attic subcontract. (2) Swanson approved all checks signed by Lyle before they were delivered. (3) Most of Lyle's complaints were made to Swanson, who undertook to relay them to Hollingsworth and Patillo, and thereby gave the impression that Swanson was supervising the work. As we say, these facts and others in the record are strong circumstances tending to support Lyle's contention that Latourette was the contractor in fact.

But a careful review of the record necessitates that we deny this contention. Here are our reasons: The signed contract was between Lyle on the one part and Hollingsworth and Patillo on the other. Before we would be justified in setting aside this written contract, then the evidence going in that direction would have to be clear and satisfactory. As we said in *Morrilton Ice Co. v. Montgomery,* 181 Ark. 180, 25 S. W. 2d 15: " 'The solemn written agreement of contracting parties cannot be reformed or amended, except upon clear and satisfactory proof that the writing fails, by reason of fraud, accident or mutual mistake in the preparation or execution thereof, to express the agreement intended to be entered into.' *Mitchell Mfg. Co.* v. *Kempner,* 84 Ark. 349, 105 S. W. 880 . . ."

We cannot say that the evidence, as claimed by Lyle, rises to the required level of "clear and satisfactory." Latourette and Swanson both testified that the contract, as written, reflected the real intention of the parties, and that Hollingsworth and Patillo were the contractors. Lyle identified the contract with Hollingsworth and Patillo; and even though he said he thought he was dealing with Swanson and Latourette, still Lyle did not testify that the contract was fraudulent. Patillo admitted that he and Hollingsworth made the contract with Lyle, and then sublet a portion of it to Swanson (who was acting for Latourette as we have previously stated). Here is Patillo's testimony: "Q. Ace, you and Mr. Hollingsworth, you as superintendent, made a contract with Jimmie Lyle to do what you called this second job for $3,584? A. That's right. Q. That was everything? Then following that you and Mr. Hollingsworth made a contract with Mr. Swanson for Mr. Swanson to do certain work in connection with the attic for a sum of $540? That was Jim's (Swanson's) personal contract? A. Yes, as far as I know. Q. You made the contract with him, not with Latourette? A. Yes, with Jim Swanson."

Lyle's attorney in the letter previously copied admitted that Hollingsworth and Patillo were the principal contractors and Latourette was a subcontractor on the attic insulation. With all of the foregoing evidence in the record, we cannot say that the chancellor was in error in finding, as he did, that Hollingsworth and Patillo were the principal contractors and Latourette was a subcontractor only on the attic insulation. So, we deny Lyle's contention that Latourette was the principal contractor.

II. *Delivery of the Materials.* Lyle claims that there was not sufficient proof that *all* of the materials sued for were actually delivered to the job; and he lists twelve invoices totalling $157.78 which were either totally unsigned or signed by persons whose authority to sign for Hollingsworth and Patillo was not shown. The law is well settled that a materialman must both allege and prove that the material, for which he claims a lien, was

furnished for, and used in, the work. *Hill* v. *Imboden*, 146 Ark. 99, 225 S. W. 330; *Central Lumber Co.* v. *Braddock Land & Granite Co.*, 84 Ark. 560, 105 S. W. 583, 13 Ann. Cas. 11. But in the case at bar the appellee made sufficient proof. Lyle testified that all the material used on the job was purchased from Latourette so far as he knew. Patillo examined the itemized statement sued on by Latourette and testified that all the material shown on the statement was received. There was no complaint about the receipt of the material. The only complaint was the quality of the material. Patillo said: "Q. Now, then, you have seen this itemized statement that he had—that was practically correct, wasn't it? A. That statement—if it had been correct . . . Q. Did you get the material? That's what I'm talking about. A. That's right. Q. The complaint that you have about it would be that he furnished materials that were not up to specifications? A. That's right."

The testimony of Latourette and Swanson about the itemized statement and the admission by Patillo, and the other evidence in the record, are sufficient to sustain the finding made by the Chancery Court that the material sued for was actually delivered to and used in the work.

III. *The Attic Subcontract.* It will be recalled that Latourette accepted from Hollingsworth and Patillo the subcontract to furnish the materials and ceil the attic for $540. Under date of August 7, 1943, Hollingsworth and Patillo advised Lyle in writing as follows:

"With further reference to the insulation job on your residence in the City of Jonesboro, Arkansas, this is to advise you that we, Hollingsworth & Patillo, have made a separate contract with P. M. Latourette, doing business as Jonesboro Builders Supply Co., of Jonesboro, Arkansas, to do the insulation work on your residence.

"Upon completion of insulation contract, this will be your authority to pay to Jonesboro Builders Supply Co. the sum of five hundred forty and no/100 dollars ($540)."

In a letter from Lyle's attorney to Latourette, as previously quoted, it was stated that this attic subcontract was for $540 "according to specifications of the original contract." Now, the specifications of the original contract stated that the ceiling of the attic was to be with "½ inch insulation board"; and it is undisputed that the work was done with "¼ inch wall board." Lyle asked judgment for $330.57 as the amount required to take off the ¼ inch wall board and replace it with ½ inch insulation board. To defeat Lyle in this cross-complaint, Latourette made two defenses: (a) the plans were changed before signing, so as to provide for ¼ inch wall board; and (b) Lyle accepted the attic subcontract as completed, and paid for it, so he cannot now be heard to rue back on his acceptance of the completed job. Either defense is sufficient. Without reviewing the evidence, we content ourselves by stating that Latourette did not establish his first defense, and but for the second defense we would hold for Lyle on his cross-complaint. But we must and do hold with the Chancery Court that Latourette did establish his second defense in this:

It is admitted that on August 19, 1943, Lyle paid Latourette $786.06, and received a credit for $14.85, making a total of $800.91. Latourette claimed that this $800.91 was to pay $304.31 on a personal account of Lyle for some previous work, independent of the Hollingsworth and Patillo contract, and that $540 was for the complete insulation subcontract. To support his testimony, Latourette introduced the office book carbon copy of the receipt which he claimed was delivered to Lyle, and which read as follows: "No. 848, August 19, 1943; received of Jimmie Lyle eight hundred and 91/100 dollars ($800.91) *prs. a/c and insulation* contract. Jonesboro Builders Supply Co. P. M. Latourette." The italicized words (italics our own) were testified to as meaning "personal account and insulation contract." Lyle admitted paying the money on August 19th, but denied receiving any such receipt. He admitted that part of the money was to pay the "personal account," but denied

that the balance was to pay for the attic subcontract. According to the itemized statement in the record, the personal account was $304.31. The total lien claim in this suit is $401.50. Thus, on August 19, 1943, the personal account and the lien claim here involved would be only $705.81; and this amount falls short of the $800.91 shown to have been received by Latourette. This is not explained by Lyle's testimony; and under any possible theory some part of the money from the $800.91 must have been on the attic subcontract.

We conclude that the preponderance of the evidence supports the finding of the chancellor, that on August 19, 1943, Lyle paid Latourette in full for the attic subcontract, and thereby accepted the work as complete, with the 1/4 inch wall board rather than the 1/2 inch insulation board; and that Lyle cannot now be heard to cross-complain on the attic subcontract which he had accepted by payment. Payment in full and without reservation was an acceptance of the work. *Interstate Grocer Co.* v. *Namour,* 201 Ark. 1095, 148 S. W. 2d 175.

IV. *The Contract Price as the Limit of the Owner's Liability.* Finally, Lyle insists that a lien claimant (such as Latourette here) is limited in recovery to the contract price between the owner and the contractor, and that when the owner has paid the full amount of the contract price, he cannot be required to pay any more to anyone. This is the "contract price limitation" rule as stated in § 4975 of Kirby's Digest, as follows: "Nothing herein contained shall be so construed as to give contractors, subcontractors or laborers or material furnishers liens for any greater amount in the aggregate than that contracted for between the employer and contractor; provided, that the owner, employer or builder shall pay no money to the contractor until all laborers and mechanics employed on the same and all material furnishers shall have been paid for work done or material furnished." This rule is recognized in 36 Am. Juris. 144, as follows: "If, after the contractor has abandoned the work, the owner completes it at a cost in excess of the original con-

tract price, and pays the amount due under the contract to some lienors to the exclusion of others, he may be compelled to pay the latter their pro rata share of the original contract price, less the extra cost of completing the building, . . .''

To sustain this rule, Lyle cites such cases as: *McFadden* v. *Stark*, 58 Ark. 7, 22 S. W. 884; *Long* v. *Chas. T. Abeles*, 77 Ark. 156, 93 S. W. 67; *Cost* v. *Newport Builders' Supply & Hardware Co.*, 85 Ark. 407, 108 S. W. 509, 14 Ann. Cas. 142; *Marianna Hotel Co.* v. *Livermore Foundry & Machine Co.*, 107 Ark. 245, 154 S. W. 952; and to these might well be added *Sternberg* v. *Ft. Smith Refrigerator Works*, 87 Ark. 56, 112 S. W. 174, 20 L. R. A., N. S., 89. We refer to these as the ''contract price limitation'' cases.

To bring himself within the ruling of these cases, Lyle showed that the total contract price was $3,584; and that he had paid out at the time of the trial against that contract price, the following:

Paid through Hollingsworth and Patillo before
    they abandoned the contract..............................................$2,527.00
Paid Latourette on August 19, 1943 (in excess of
    personal account) ................................................................ 540.00
Paid other workmen in an endeavor to complete
    the contract according to specifications............ 989.89
        Total.........................................................................................$4,056.89

On these figures Lyle claims that he should not be required to pay the lien claim of Latourette, since Lyle has already paid out more than the contract price.

The answer to this contention of Lyle is found in the fact that the statute (which limited the extent of recovery to the contract price) was expressly repealed by § 6 of Act 446 of 1911; and the cases cited by the appellant were decided before this said repeal. A brief review will serve to clarify the answer:

Act 107 of 1873 created statutory liens for mechanics, laborers, and materialmen. Section 19 thereof pro-

vided: "Nothing herein contained shall be so construed as to give a subcontractor, or laborer, or material furnisher a lien for any greater amount than that originally contracted for between the employer and contractor." This quoted section became § 4424 of Mansfield's Digest of 1884, and was expressly left in full force by Act 57 of 1885, and was in full force and effect in 1893 when this court rendered its opinion in *McFadden* v. *Stark, supra.* This quoted statute accounts for the language in that opinion.

Then came Act 146 of 1895 which was an act of 26 sections, repealing all of Act 107 of 1873 and all of Act 57 of 1885, and making a new statute on liens for mechanics and materialmen. But § 18 of Act 146 of 1895 preserved the language of § 19 of Act 107 of 1873 (§ 4424, Mansfield's Digest), and added a proviso thereto. This entire § 18 of Act 146 of 1895 reads: "Nothing herein contained shall be so construed as to give contractors, subcontractors or laborers or material furnishers liens for any greater amount in the aggregate than that contracted for between the employer and contractor; *provided,* that the owner, employer or builder shall pay no money to the contractor until all laborers and mechanics employed on the same and all material furnishers shall have been paid for work done or material furnished." This § 19 of Act 146 of 1895 became § 4975 of Kirby's Digest of 1904, and was in full force and effect in 1905 and in 1908 when this court rendered the opinions in *Long* v. *Abeles, supra; Cost* v. *Newport Co., supra; Sternberg* v. *Ft. Smith Refrigerator Works, supra;* and was also in effect in 1910 at the time of the contract involved in the case of *Marianna Hotel Co.* v. *Livermore, supra.* Although that case was not decided by this court until 1913, it was governed by the law that existed when the materials were furnished in 1910.

Then came Act 446 of 1911 which was approved June 2, 1911, and became effective ninety days later. Section 6 of this last-mentioned act says: "Section 4975 of Chapter 101 Kirby's Digest of the Statutes of Arkansas is hereby repealed."

It was this § 4975 of Kirby's Digest that had limited the lien claimants to the original contract price between the owner and the contractor; and the effect of the repeal of this section was to remove the limitation on the lien claimant. In *Beloate* v. *W. L. Baker & Co.*, 126 Ark. 67, 189 S. W. 354, we stated that § 4975 of Kirby's Digest was repealed.

We have seen fit to elucidate on this point, because the appellant has cited *Terry* v. *Klein*, 133 Ark. 366, 201 S. W. 801, decided in 1918, as a case in which the "contract price limitation" rule was mentioned, and not stated to be repealed. It is true that this rule was mentioned in that case, but the rule was not enforced; and because it was not enforced, the court saw no occasion to state that the rule had been outmoded by the legislative enactment of 1911.

The result of Act 446 of 1911 is to allow lien claimants to establish their liens against the buildings, etc. (as stated in §§ 8865-67 of Pope's Digest), for the full amount of their correct claims, just as is stated in § 8893 of Pope's Digest. Of course, if and when the lien is foreclosed, and the money brought into court, then *in the proceeds*, the parties participate *pro rata,* as stated in § 8879 of Pope's Digest. But the allowance of the claims in the first instance is not limited now—since Act 446 of 1911—by the original contract price, as was the rule in the cases decided before Act 446 of 1911 became effective.

It follows, therefore, that the contract price limitation is no longer the law in this state, and is therefore no defense available to the appellant herein; and on the whole case we affirm on the direct appeal of Lyle.

V. *Appellee's Cross-Appeal.* The appellee prayed for judgment for "$401.50 with interest and costs," and that the same be adjudged a lien on the property of Lyle. The Chancery Court fixed the lien claim of appellee to be $386.50 with interest, as hereinafter stated, and allowed appellee only one-half of the costs up to the time of the decree. Appellee by cross-appeal complains of the $15

taken off of his claim, and of the failure to recover all costs and all interest. We now examine these contentions: (a) The $15 was deducted from the $401.50 because of some defective workmanship; and we cannot say that the decision of the Chancery Court on this issue was against the preponderance of the evidence. (b) The costs were divided in the Chancery Court because Latourette had been obliged to retake most of his depositions through no fault of Lyle. This being a chancery case, the matter of costs was in the sound discretion of the chancellor, and we believe he wisely exercised his discretion. *Mt. Nebo Anthracite Coal Co.* v. *Martin,* 86 Ark. 608, 111 S. W. 1002 and 112 S. W. 882; *Bank of Dermott* v. *Measel,* 172 Ark. 193, 287 S. W. 1017.

(c) The interest issue has given us considerable concern. The trial court allowed interest at six per cent. from August 21, 1943 (the date of the last item furnished), to January 1, 1945 (the date the case was submitted to the Chancery Court), and from September 7, 1945 (the date of the decree), until paid. In other words, the Chancery Court held the case under submission from January 1, 1945, until September 7, 1945, and disallowed interest during that time. The appellee complains of this loss of interest for eight months and seven days.

The studious effort of the Chancery Court to correctly decide the various legal issues and the highly controversial facts is splendidly shown in the court's findings, to which we have previously made reference. But when interest once begins to run on a claim, it continues to run pending decision by the courts, if the delay is not the fault of either party. In 33 C. J. 245 the rule is stated: ''The pendency of litigation between the parties to an existing debt concerning the same will not of itself suspend interest on such debt during such litigation, where the money is not paid into court.'' So, we hold that interest continued to run during the time this case was under consideration by the Chancery Court.

But we hold that the interest did not commence to run until September 27, 1943. In *Rogers* v. *Yarnell,* 51

Ark. 198, 10 S. W. 622, Chief Justice COCKRILL, speaking for this court, said: "It is the rule in this state to allow interest on open accounts after the term of credit has expired. *Roberts* v. *Wilcoxson,* 36 Ark. 355; *Texas & St. L. Railway* v. *Donnelly,* 46 Ib. 87; *Tatum* v. *Mohr,* 21 Ib. (349) 355." We adhered to that rule in *Busch* v. *Gecks, ante,* p. 431, 190 S. W. 2d 625.

In the case at bar Latourette wholly failed to allege in the complaint, or to show in the proof, that interest commenced on any date prior to the filing of the lien claim on September 27, 1943. So far as we have been able to find, no invoice or statement of account in the case recites that interest would begin when the items were furnished or at any time thereafter. The filing of the lien claim on September 27, 1943, was thus the first declaration of the maturity of the account.

We hold, therefore, that the Chancery Court should have allowed interest at six per cent. on the $386.50, from September 27, 1943, until paid; and only to this extent do we modify the decree of the Chancery Court on the cross-appeal.

We tax the costs of this court equally between appellant and appellee.